UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
JOANNE SHARPE,

                              Plaintiff,              6:08-CV-627

         v.

UTICA MUTUAL INSURANCE COMPANY,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                            OF COUNSEL:

GREENE, HERSHDORFER, & SHARPE      THOMAS J. MURPHY, ESQ.
Attorneys for Plaintiff
One Lincoln Center, Suite 330
Syracuse, New York 13202


GORDON & REES LLP                   MERCEDES COLWIN, ESQ.
Attorneys for Defendant                BROOKE A. SCHNEIDER, ESQ.
90 Broad Street, 23rd Floor
New York, New York 10004


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

        Plaintiff Joanne Sharpe ("plaintiff" or "Sharpe") brought suit against Utica Mutual

Insurance Company ("defendant" or "Utica Mutual") alleging retaliation and hostile work

environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as

amended by the Civil Rights Act of 1991 ("Title VII").  Plaintiff alleges that her former

employer, Utica Mutual, subjected her to a hostile work environment resulting in job

termination, in retaliation for her opposition to sexual harassment in the workplace and for filing charges of sexual harassment and retaliation with the New York State Division of Human Rights ("DHR").

Defendant moved for summary judgment to dismiss the complaint pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.  Plaintiff opposed the retaliation motion.  Oral argument was heard in Utica, New York on March 19, 2010.  Decision was reserved.

## II. BACKGROUND

The following facts are viewed in the light most favorable to Sharpe, the non-movant, as must be done on a summary judgment motion.

### A. First Charge of Discrimination Filed with the DHR

Plaintiff began her employment at Utica Mutual in August 1979 in the record unit. In 1993 she became a Claims Staff Assistant/Business Analyst in defendant's Claims Systems Administration ("Claims").  She alleges she was first subjected to sexual harassment between 1993-1996 by her then-supervisor, Ray Murphy.  As the harassment continued, she complained about Mr. Murphy's behavior to defendant's General Counsel in December 1998.  Following another incident of sexual harassment during spring 1999, plaintiff filed a sexual harassment complaint with the DHR in April 1999.

After conducting its own internal investigation in late 1999 and early 2000, Utica Mutual demoted Mr. Murphy from his supervisory position.  Plaintiff alleges she was thereafter subjected to a number of retaliatory acts as a result of her sexual harassment complaint, including being forced to sit next to Mr. Murphy after his demotion and being excluded from the initial implementation of a new computer system.  Mr. Murphy retired from his position in 2001 due to a serious heart condition and later died in March 2002.  Plaintiff

contends that after Mr. Murphy's death some of her co-workers commented that her sexual harassment complaint against Mr. Murphy exacerbated his heart condition and contributed to his death.  She alleges she had a conversation with her co-worker, Deb Cabral, during which she learned that Ms. Cabral, Vice-President of Claims Operations John Nobles, and Supervisor Michael Buttimer all believed her sexual harassment claim contributed to Mr. Murphy's death.

Plaintiff's 1999 DHR complaint was scheduled for a hearing in January 2003.  Prior to the hearing Ms. Cabral refused to testify in support of plaintiff's sexual harassment claim. Sharpe withdrew her complaint in February 2003 having lost her primary witness and in hopes of preventing future retaliation.  In early 2003, after plaintiff withdrew her complaint, Mr. Nobles appointed Ms. Cabral to a newly created supervisory position within plaintiff's department.  Plaintiff believed Ms. Cabral was being rewarded for refusing to testify on her behalf in the DHR proceeding.  In March 2003 plaintiff contacted Human Resources concerned that Ms. Cabral's appointment was an act of retaliation for her sexual harassment complaint in 1999.  She also expressed concern that she would be treated unfairly by Ms. Cabral because she was blamed by Ms. Cabral for Mr. Murphy's death.  As a result, Nina Owens in Human Resources arranged a meeting between plaintiff and Ms. Cabral.  Ms. Cabral assured plaintiff she would be treated fairly under her supervision.

In August 2003 Sharpe received a sub-par performance evaluation from Ms. Cabral and Mr. Buttimer.[1]  Plaintiff objected to the accuracy of the evaluation and refused to sign it after it was read aloud to her.  She was upset as a result of the evaluation and was

---

[1] The performance review indicated an overall rating of "(2) Does not fully meet the expectations of the position."  Colwin Decl., Ex. 26, Dkt. No. 16-15.

subsequently out of work on sick leave from August 28, 2003, until October 8, 2003.  While away from work she was examined by a physician and diagnosed with rapid heartbeat due to stress.  She remained home from work for four weeks before receiving notification that she would be terminated if she did not return by October 8, 2003.  She returned to work by defendant's deadline.

### B.  Second Charge of Discrimination Filed with the DHR

Upon her return to work, Sharpe filed a second DHR complaint in October 2003 alleging that her 2003 sub-par evaluation was an act of unlawful retaliation for her 1999 sexual harassment charge.  She also alleged that her exclusion from the new computer system implementation, the statement by Ms. Cabral blaming plaintiff for Mr. Murphy's death, Ms. Owens' alleged disregard of plaintiff's concerns of retaliation, and Ms. Cabral's refusal to testify in the previous DHR proceeding were all in retaliation for her initial 1999 complaint. The DHR dismissed this complaint in June 2004 after determining there was no probable cause to believe the 2003 evaluation was motivated by plaintiff's 1999 DHR complaint of sexual harassment.[2]

### C.  Time Period After the 2004 DHR Decision

Sharpe received satisfactory ratings during her next two evaluations prepared by Mr. Buttimer in 2004 and 2005.[3]  Throughout 2004 and into 2005, plaintiff missed approximately 106 hours of work due to stress-related irritable bowel syndrome.

---

[2] Plaintiff notes she was never interviewed or questioned relative to the details of her 2003 DHR complaint and the decision did not accurately reflect the events.

[3] In February 2004 Ms. Cabral took a medical leave of absence from Utica Mutual and went on permanent disability leave in July 2004.  As a result Mr. Buttimer conducted plaintiff's 2004 and 2005 evaluations.

Consequently, in August 2005, a review of her attendance was deemed "[s]ometimes less dependable to due to frequent absences."  Colwin Decl., Ex. 32, Dkt. No. 16-16.

In September 2005 plaintiff's co-worker, Christine Wilson, replaced Ms. Cabral as her direct supervisor.  In January 2006 Utica Mutual instituted a new policy requiring staff coverage from 8:00 a.m. until 5:00 p.m.  Accordingly, employees within plaintiff's department were required to rotate among three eight hour shifts to ensure compliance with the new policy.  These shifts were: 1) 7:00 a.m. to 3:00 p.m.; 2) 8:00 a.m. to 4:00 p.m.; and 3) 9:00 a.m. to 5:00 p.m.  Plaintiff requested she be permitted to remain permanently on the 7:00 a.m. to 3:00 p.m. shift so she could continue to meet her granddaughter at the school bus stop after school.  Ms. Wilson denied this request.[4]  In addition, plaintiff claims she was the only employee in her department to be denied vacation time by Ms. Wilson and that Ms. Wilson singled her out on three separate occasions for using work time to complete non-work related tasks.[5]  One incident involved Ms. Wilson going through plaintiff's desk to confiscate crossword puzzles.  Plaintiff later received a satisfactory evaluation from Ms. Wilson in August 2006.

On March 6, 2007, plaintiff sent Ms. Wilson, Mr. Nobles, and Mr. Buttimer an email complaining of several events, including the confiscation of the crossword puzzles from her desk, being reprimanded in front her co-workers for conducting personal tasks during work

---

[4] Prior to 2006, plaintiff had been working the 7:00 a.m. to 3:15 or 3:30 p.m. shift since approximately 1993.

[5] One incident involved plaintiff looking at a holiday gift wrap catalog during work hours.  Ms. Wilson called plaintiff into her office to reprimand her and plaintiff advised that it was the corporate sponsored catalog from which everyone else had already placed their orders.  Another time Ms. Wilson reprimanded plaintiff for making an entry into her checkbook during the work day even though other employees in the department often did the same.  Sharpe  was not written up for either of these incidents.

hours, the failure to reprimand a co-worker for kicking her in the buttocks when she bent over to pick up a document that had fallen to the floor, and being prohibited from making direct edits to errors on claim forms.  In response, Mr. Nobles encouraged plaintiff to discuss her complaint further with Ms. Wilson and Mr. Buttimer as they were her direct supervisors.

Without going into the specific events, Sharpe contacted Ms. Owens in Human Resources on March 9, 2007, to indicate that she had "a work related problem that is going to require HR intervention."  Colwin Decl., Ex. 45, Dkt. No. 16-17.  Ms. Owens held a meeting with plaintiff on March 12, 2007.  Plaintiff stated to Ms. Owens that she was being retaliated against because of her 1999 sexual harassment complaint against Mr. Murphy.  At the end of the meeting Ms. Owens agreed to launch an investigation into her complaints of retaliation. Ms. Owens interviewed 19 of plaintiff's co-workers, but none of the employees indicated she was treated differently on account of her prior complaints of sexual harassment and retaliation.  To the contrary, many of the employees interviewed indicated she performed poorly at work and that her work product was not commensurate with someone of her experience.

Prior to the completion of Ms. Owens' investigation, Mr. Nobles personally went to the Special Investigations Unit ("SIU"), located next to Claims, to question SIU employees as to their communications with plaintiff.  Mr. Nobles questioned several individuals as to whether they provided Sharpe with legal advice concerning her workplace complaints.  They all denied doing so.

Ms. Owens met with plaintiff on March 28, 2007.  The lack of support for plaintiff's most recent complaint of retaliation and the performance issues raised by her co-workers were discussed.  After Ms. Owens shared her findings with Ms. Wilson and Mr. Buttimer,

three meetings were scheduled with plaintiff at 30 day intervals to review her job performance.  These meetings were held on April 27, May 24, and July 27, 2007.[6]  During each meeting, Ms. Wilson and Mr. Buttimer criticized plaintiff's job performance and cited specific examples of errors she made.  At the July 27 meeting, Ms. Wilson and Mr. Buttimer explained to plaintiff that she was being placed on probation because of the need for improvement.  Defendant alleges Sharpe's job performance did not improve within the next 30 days, and accordingly, she was terminated on September 13, 2007.

On October 24, 2007, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging she was retaliated against for having filed her earlier sexual harassment complaint in 1999.  The EEOC later informed plaintiff that the 180 day time period after filing her complaint expired on June 4, 2008.  No administrative appeal nor final action has been taken.  Plaintiff filed the complaint in the instant action on June 16, 2008.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).  Initially, the burden is on the moving party to

---

[6] Defendant maintains the first and third meetings occurred on April 26 and July 25, 2007, respectively.  The disagreement is immaterial.

demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477

U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

After the moving party has satisfied its burden, the non-moving party must assert

specific facts demonstrating there is a genuine issue to be decided at trial.  Fed. R. Civ. P.

56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511.  The non-moving party "must do

more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient

evidence upon which a reasonable fact finder could return a verdict for the non-moving party.

Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475

U.S. at 587, 106 S. Ct. at 1356.

## IV.  **DISCUSSION**

Utica Mutual moved for summary judgment dismissing both the hostile work

environment and retaliation causes of action.  Plaintiff withdrew the hostile work environment

claim but opposed defendant's motion for summary judgment on the retaliation claim.

Plaintiff contends she was retaliated against on numerous occasions between 1999

and 2007 with the final act of retaliation being her termination on September 13, 2007.

Defendant claims Sharpe's allegations of retaliation are unsubstantiated and that she was

terminated for her poor work performance.  Utica Mutual specifically argues that because

Sharpe cannot demonstrate that she engaged in any activity protected by Title VII and

cannot demonstrate a causal connection between such activity and an adverse employment

action, her retaliation claim fails as a matter of law.  In response plaintiff maintains that, to

the contrary, she engaged in protected activity on multiple occasions beginning in 1999, and

that she has adequately demonstrated a causal connection between her protected activity and the many adverse employment actions she suffered.

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter." Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a) (2003)), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006).  Title VII retaliation claims are evaluated under a three step burden shifting analysis.  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); McDonnell Douglas Corp. v. Greene, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 1824-26 (1973). First, a plaintiff must carry her minimal burden of demonstrating a prima facie case of retaliation.  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  If the plaintiff sustains this initial burden, "a presumption of retaliation arises."  Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (quoting Jute, 420 F.3d at 173).  The defendant then has the burden of showing "a legitimate, non-retaliatory reason for the adverse employment action."  Hicks, 593 F.3d at 164 (quoting Jute, 420 F.3d at 173).  Finally, if the defendant carries his burden"the presumption of retaliation dissipates" and the plaintiff must demonstrate that the legitimate reason offered is mere pretext for retaliation.  Hicks, 593 F.3d at 164-65 (quoting Jute, 420 F.3d at 173).  The Second Circuit recently articulated the McDonnell Douglas framework in the context of a motion for summary judgment:

> At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action.  If the employer produces such evidence, the employee must, in order to avoid summary judgment,

> point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action.

Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552-53 (2d Cir. 2010).

## A.  **Prima Facie Case of Retaliation**

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: 1) she engaged in protected activity; 2) the employer was aware of that activity; 3) plaintiff was thereafter subjected to an adverse employment action; and 4) there was a causal connection between plaintiff's protected activity and the adverse action.  See, e.g., id. at 552; Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007); Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).

Plaintiff's prima facie burden at the summary judgment stage has been characterized as "minimal" and "de minimis."  Woodman v. WWOR-TV, 411 F.3d 69, 76 (2d Cir. 2005) (quoting Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  See Jute, 420 F.3d at 173 (citing Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987)).

### 1.  Protected Activity

Sharpe relies upon her 1999 and 2003 DHR complaints in addition to her March 2007 internal complaint to establish that she engaged in protected activity.  Defendant contends that plaintiff's March 2007 email complaints sent to Ms. Wilson, Mr. Nobles, Mr.

Buttimer, and later to Ms. Owens do not constitute protected activity because none of the emails complained of an unlawful employment practice.

To satisfy the protected activity prong, a plaintiff need only "have had a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by Title VII." Kessler, 461 F.3d at 210 (quoting McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001)).  Internal or informal complaints of discrimination on a basis prohibited by Title VII are protected activity.  See Amin v. Akzo Nobel Chems., Inc., 282 F. App'x 958, 961 (2d Cir. 2008) (Summary Order); Raniola v. Bratton, 243 F.3d 610, 624-25 (2d Cir. 2001).

To the extent Sharpe is relying on her 1999 and 2003 DHR complaints, these activities undisputably constitute protected activity.  With regard to the March 2007 emails, although they indicate plaintiff believed she was being treated unfairly, she never stated that the actions were motivated by her membership in a protected class or her prior complaints of sexual harassment.  However, during her March 12, 2007, meeting with Ms. Owens, plaintiff stated that Ms. Wilson, Mr. Buttimer, and Mr. Nobles all "hated" her because of her sexual harassment complaint against Mr. Murphy in 1999.  Colwin Decl., Ex. 15 ("Owens Aff.") Dkt. No. 16-11, ¶ 24.

Viewing the facts in the light most favorable to plaintiff, the 1999 and 2003 DHR complaints constitute protected activity as does the March 2007 internal complaint because she had a good faith belief that she was opposing defendant's retaliation by expressing her concerns to Ms. Owens and indicating in the meeting that the retaliation was due to her earlier sexual harassment complaint.

### 2.  Defendant's Awareness of the Protected Activity

Sharpe alleges each of the individuals who retaliated against her were at least

generally aware of her prior complaints of sexual harassment and retaliation because some

had personally witnessed Mr. Murphy's behavior and others had been questioned during the

investigation of her earlier complaints.  In furtherance of their argument that the 2007 internal

complaints do not constitute protected activity, Utica Mutual argues that they could not have

known plaintiff was engaging in protected activity because she did not indicate in the emails

that she was opposing an unlawful employment practice or that she was being retaliated

against for her earlier sexual harassment and retaliation complaints.

Construing Utica Mutual's notification regarding the 1999 and 2003 DHR

complaints, Sharpe's statement to Ms. Owens during their March 12, 2007, meeting, and her

supervisors' subsequent involvement in the investigation in the light most favorable to her,

Utica Mutual was aware of plaintiff's protected activity.

### 3.  Materially Adverse Employment Actions

Sharpe identifies the following materially adverse employment actions between

1999 to 2007: 1) assigning Mr. Murphy to sit directly next to her after he was demoted and

while the sexual harassment complaint was pending; 2) being excluded from the

implementation of the new computer system; 3) being advised that she was partially

responsible for causing Mr. Murphy's death by Ms. Cabral, Mr. Buttimer, and Mr. Nobles; 4)

being screamed at by Ms. Cabral when she received notice of her being named as a witness

in plaintiff's sexual harassment action; 5) being pressured by Ms. Cabral to withdraw the

sexual harassment complaint after her outburst and refusal to testify; 6) having her complaint

of retaliation regarding Ms. Cabral's promotion to supervisor dismissed by Human Resources

without investigation; 7) the 2003 inaccurate evaluation prepared by Ms. Cabral and Mr.

Buttimer in retaliation; 8) the 2005 evaluation focusing on her absences and less than

dependable schedule when supervisors were aware of her medical condition of irritable

bowel syndrome caused by work related stress; 9) disparate treatment from Ms. Wilson

including rescheduling of hours, refusal to grant requested vacation time, reprimanding her

for minor non-work related activities,[7] being prohibited from consulting with the Information

Technology ("IT") department, and being reprimanded for making corrections to claims

entries; 10) the 2006 evaluation by Ms. Wilson and Mr. Buttimer containing untruthful and

inaccurate comments; 11) the February 2007 follow-up review alleging feedback that was

never received; 12) Mr. Nobles' March 2007 refusal to meet with plaintiff; 13) Ms. Owens'

biased investigation of plaintiff's March 2007 retaliation complaint;14) Mr. Nobles' improper

interference in the Human Resources investigation of plaintiff's complaint; 15) the resulting

discipline stemming from the investigation of her March 2007 complaint[8]; 16) the 30, 60, and

90 day follow-up meetings consisting of pre-drafted and pre-mediated criticisms without any

interim feedback; 17) exclusion from the June 2007 Business Analyst training; 18) being

placed on probation based on an almost 30 day old pre-meditated report; 19) being

terminated on September 13, 2007, based on a two week old summary containing pre-

drafted criticisms by Ms. Wilson.  See Pl's. Mem. of Law in Opp'n ("MOL"), Dkt. No. 25,

15-17.

_____

[7] As previously discussed, plaintiff alleges Ms. Wilson went through her desk to confiscate crossword puzzles which Ms. Wilson believed she was doing at work.  Plaintiff also testified that Ms. Wilson criticized her for looking at a holiday gift wrap catalog during working hours when other employees were permitted to look at the catalog without being reprimanded.  Lastly plaintiff alleges she was criticized for putting an entry into her checkbook during work hours when other employees were permitted to handle similar personal business.

[8] It is unclear which discipline plaintiff is referring to.  Presumably it is either the verbal warning given to her in the March 28, 2007, meeting when Ms. Owens informed her of the results of the investigation or the written warning issued to her on May 24, 2007.

In New York, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory or retaliatory conduct.  Kriss v. Schenectady City Sch. Dist., No. 1:08-CV-0230, 2010 WL 3338949, at *10 (N.D.N.Y. Aug. 24, 2010) (Suddaby, J.). Defendant asserts that many of plaintiff's claims occurred before the 300 day window and, as such, those claims must be dismissed.  However defendant does not identify which adverse acts should be dismissed for untimeliness.  "The three hundred day period serves as a statute of limitations, and claims regarding acts that occurred more than three hundred days prior to the employee's initiation of administrative review are thus time-barred" unless the continuing violation doctrine applies.  Id. (quoting Klein v. N.Y. Univ., No. 07 Civ. 160, 2008 WL 3843514, at *2 (S.D.N.Y. Aug. 14, 2008)).

The continuing violation theory provides that "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."  Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993).  The Supreme Court has held that the continuing violation doctrine does not apply to Title VII claims alleging discrete acts of retaliation.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 104-05, 113, 122 S. Ct. 2061, 2068, 2072 (2002).  Therefore acts occurring more than 300 days prior to the filing of an EEOC charge are barred even where they relate to acts alleged in a timely filed charge.  Id.  Plaintiff filed the retaliation charge related to this suit with the EEOC on October 24, 2007.  She now alleges 19 specific acts of retaliation and the continuing violation doctrine does not apply.  Therefore she may only include acts of retaliation occurring within 300 days prior to October 24, 2007.  Accordingly,

plaintiff is precluded from asserting any pre-December 28, 2006, conduct by defendant as specific acts of retaliation.

In addition to being within the statute of limitations, alleged acts must be materially adverse.  In determining whether conduct is materially adverse, the Supreme Court has held that a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington, 548 U.S. at 68, 126 S. Ct. at 2415 (citations and internal quotations omitted).  The Second Circuit's recent holding in Hicks refined the standard for materially adverse employment actions.  See Hicks, 593 F.3d at 165.  First, the Hicks Court noted that the anti-retaliation provision is broader than the anti-discrimination provision and extends beyond workplace related acts and harm.  Id.  Second, Title VII does not set forth a code of general civility and minor annoyances in the workplace do not constitute actionable retaliation.  Employees are only protected from retaliation that produces an injury or harm.  Id.  Third, while courts should employ the objective standard of a reasonable employee, the context in which the conduct occurs must be considered.  Id. Lastly, "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." Id. (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006)).

### a. Acts 1-10

Mr. Murphy's seat assignment after his demotion, act one, is time-barred because it occurred sometime during 1999-2000.  See Sharpe Aff., Dkt. No. 23, ¶ 48, 52, 53.  Plaintiff's exclusion from the new computer system implementation, act two, occurred in the year 2000

and is too remote to be included.  Id. at ¶ 54.  According to plaintiff, the statement by Ms. Cabral blaming her for Mr. Murphy's death, act three, occurred shortly after Mr. Murphy's death in March 2002.  Plaintiff has provided no further details regarding the date of this comment, but it happened at some point before her 1999 sexual harassment complaint came up on the DHR docket in January 2003.  In any event this statement was made long before December 28, 2006.

Likewise acts four and five – Ms. Cabral's responses to the upcoming DHR proceeding – both occurred in January 2003.  Act six, Ms. Owens' alleged disregard of plaintiff's concerns of retaliation, occurred in March 2003.  Each of these acts took place before December 28, 2006, and are time-barred.  Act seven, the 2003 inaccurate evaluation prepared by Ms. Cabral and Mr. Buttimer, is also outside the proscribed window. Regardless, in 2004 the DHR found there was no probable cause to believe that plaintiff's rating of "2" on her 2003 evaluation was in retaliation for her 1999 sexual harassment complaint.  Because plaintiff's 2003 retaliation complaint with the DHR arose from the same facts as in the instant case, the DHR's decision has preclusive effect in this action.  Vargas v. City of N.Y., No. 01 Civ. 7093, 2008 WL 361090, at *5 (S.D.N.Y. Feb. 11, 2008) (holding that res judicata will bar relitigation of claims arising from the same facts as those adjudicated by the DHR).

The 2005 evaluation, act eight, took place on August 25, 2005, well before the December 28, 2006, cut-off date.  With respect to the disparate treatment by Ms. Wilson, act nine, each incident must be examined to determine its timeliness.  Regarding the rescheduling of hours, defendant offered evidence showing in June 2005 Mr. Buttimer informed the Claims group that beginning in January 2006 Utica Mutual's company-wide

policy would require staff coverage throughout all departments from 8:00 a.m. until 5:00 p.m. Colwin Decl., Ex. 14 ("Wilson Aff."), Dkt. No. 16-11, ¶ 4; see also Colwin Decl., Ex. 33, Dkt. No. 16-16.  It is unclear exactly when Ms. Wilson instituted the policy in Claims requiring employees to rotate shifts, but it was undoubtedly sometime before January 2006 when the company-wide policy became effective.  Even using January 2006 as the date of the retaliation, the act falls outside the December 28, 2006, deadline.

Ms. Wilson's denial of plaintiff's vacation request is likewise untimely.  Sharpe initially requested vacation time in October 2005 and Ms. Wilson advised she was not yet determining vacation schedules for 2006 because she was not sure what the company's business needs would be in 2006.  Plaintiff contacted Ms. Wilson again in April 2006 and was informed that another employee in the department had requested the same week off. See Colwin Decl., Ex. 35, Dkt. No. 16-16.  Even assuming that July 4, 2006, the day plaintiff had requested off but was denied, qualifies as the date of the retaliatory act, it is still beyond the 300 day window.

The holiday catalog incident occurred sometime during the 2006 holiday season.  It is unclear whether this means late in 2005 going into the 2006 year, or late in 2006 going into the 2007 year.  The date makes a difference for determining the event's timeliness.  Plaintiff has the burden of establishing a prima facie case, including sufficiently putting forth materially adverse employment actions.  These actions must be timely to make out a case of retaliation.  Assuming for plaintiff's benefit that she viewed the catalog in late December 2006 or even January 2007, the act would be timely.  But plaintiff has failed to show that this incident was a materially adverse employment action.  Ms. Wilson called plaintiff into her office and reprimanded her for looking at a catalog during work hours but apologized after

she learned that the catalog was the company catalog which employees were permitted to look at.  See Colwin Decl., Ex. 43, Dkt. No. 16-17.

Plaintiff has also failed to identify when the checkbook incident took place.  Even if timely, a reasonable jury could not conclude that it was a materially adverse employment action.  Sharpe was not reprimanded when she made the checkbook entry but at a later time when she expressed to Ms. Wilson that she did not have enough time to get all her work done or to take on more.  Ms. Wilson contends that she referenced the checkbook entry to demonstrate what activities are not productive.  These were both one time incidents and no disciplinary action was taken against plaintiff.

Sharpe also contends Ms. Wilson went through her desk to confiscate crossword puzzles but does not provide a date for when this took place.  Sharpe testified that she sometimes completed puzzles prior to the start of the workday or during breaks and Ms. Wilson acknowledged it was acceptable to do so at those times.  Plaintiff never personally observed Ms. Wilson searching her desk but was told by co-workers about the search.  Ms. Wilson believed plaintiff was doing the puzzles during work hours and contends that, in her supervisory capacity as well as when they were co-workers, she had observed Sharpe completing puzzles during the work day.  Ms. Wilson testified that she saw completed puzzles in plaintiff's trash bin and admitted to looking several times in a folder containing the puzzles on Wilson's desk.  Ms. Wilson later reprimanded Sharpe in her office for completing the puzzles.  Regardless of when this occurred, plaintiff has failed to show how this incident was a materially adverse employment action.

The final incident of disparate treatment that Sharpe lists is that she was the only Business Analyst prohibited from consulting IT to make edits of errors performed by Claims.

Sharpe Aff., ¶ 102.  She has not provided any information with respect to when this occurred and how it was a materially adverse employment action.  Her conclusory allegation that this was retaliatory and an act of disparate treatment is unsupported.  Without more Sharpe has not satisfied her prima facie burden on this act.

Lastly the 2006 evaluation, act 10, was prepared on or about August 22, 2006, and is outside the 300 day time period.  Acts one through 10 do not qualify as materially adverse employment actions because they either occurred outside the 300 day window proscribed by Title VII or they are not materially adverse.  Only acts 11 through 19 remain for discussion.

### b.  Acts 11, 12, and 14

Other than to contend that plaintiff's lengthy list of actions does not constitute a pattern of retaliatory conduct, defendant does not specifically address the remaining adverse acts.  Even viewing the facts in the light most favorable to plaintiff, several of the acts do not rise to the level of materially adverse employment actions.  Plaintiff claims act 11, the February 2007 review was "unprecedented", alleged "constant feedback that was never received", and stressed the "negatives."  Sharpe Aff., ¶ 103; Pl's. MOL, 16; Def's. Statement of Material Facts, Dkt. No. 18, ¶ 82-87.  Sharpe contested the contents of her 2006 evaluation and a meeting was held on February 5, 2007, to follow-up on the Performance Plan Objectives and other issues identified in the 2006 evaluation.  Ms. Wilson prepared a summary of the February 5 meeting that identified areas in which plaintiff had improved over the last six months and skills that she still needed to work on.  See Colwin Decl., Ex. 41, Dkt. No. 16-17.  Ms. Wilson also noted feedback that was provided to Sharpe since the August 2006 evaluation and indicated that a follow-up meeting would take place in three months.  Plaintiff contests that Ms. Wilson's memorandum accurately reflected what was discussed at

the meeting and she did not agree with the contents of the memorandum.  Sharpe has not

shown that this meeting or Ms. Wilson's memorandum harmed or injured her, nor has she

presented evidence that it dissuaded her from making a subsequent complaint of retaliation.

In fact plaintiff did make a complaint of retaliation soon after these events.

       Nor has plaintiff adduced evidence to show that Mr. Nobles' March 2007 refusal to

meet with her, act 12, harmed or injured her.  To the contrary, Mr. Nobles' email response to

plaintiff's complaint thoroughly responded to the specific issue involving Mr. Nobles – the

rotating shifts – and advised that the remaining issues would be more appropriately

addressed by Ms. Wilson, Sharpe's direct supervisor.  Lastly, Mr. Nobles' improper

interference in the Human Resources investigation of plaintiff's complaint, act 14, was not a

materially adverse action.  Viewing the facts in the light most favorable to Sharpe, Mr. Nobles

interfered in the investigation to discover wrongdoing by plaintiff, since Sharpe contends Mr.

Nobles was a good friend of Mr. Murphy and blamed plaintiff for his death.  However Mr.

Nobles did not discover any wrongdoing by Sharpe and she was neither harmed nor injured

as a result.  Nor did his actions affect the terms or conditions of her employment or dissuade

her from making a complaint.  Instead Mr. Nobles was disciplined for his interference.  Ms.

Owens advised him that his questioning of the SIU employees was inappropriate and that he

should refrain from further fact-finding without clearance from Human Resources to do so.

Owens Report, 7-8.  Plaintiff has not met her prima facie burden of demonstrating acts 11,

12, and 14 were materially adverse employment actions.

Plaintiff relies on <u>Lore v. City of Syracuse</u> to contend that the actions taken together constitute a pattern of retaliatory acts against her.[9]  <u>See Lore</u>, 583 F. Supp. 2d 345, 367-68 (N.D.N.Y. 2008) (Hurd, J.) ("Taken together, the discouraging effect of the alleged acts is compounded and easily meets the standard for materiality delineated in *Burlington Northern*").  The defendant contends that the alleged acts cannot be considered a pattern because of the long time period during which the acts took place.  The fact pattern in <u>Lore</u> involved a significantly shorter time period in which a pattern of actions were considered to be materially adverse.  Here, the acts span eight years and for the reasons discussed below, the lack of temporal proximity between the adverse actions ranging from 1997 to 2007 and plaintiff's protected activity does not give rise to an inference of discrimination.  Plaintiff cannot rely on a pattern of retaliation to save the otherwise insufficient alleged acts of retaliation.

### c.  Acts 13 and 15-19

With regard to acts 13 and 15 through 18, a reasonable trier of fact could conclude that plaintiff found Ms. Owens' allegedly biased investigation, the resulting discipline, the 30 day reviews, her exclusion from the Business Analyst training, and her subsequent probation, all to be materially adverse and could have dissuaded her from making or supporting a charge of discrimination.

Taking as true Sharpe's allegations and employing the standard articulated in <u>Burlington</u> and refined by <u>Hicks</u>, the acts following plaintiff's March 2007 complaint constitute

---

[9] To clarify, the compounded effect of the events in <u>Lore</u> was considered in determining that the acts were <u>material</u>.  This is distinct from the continuing violation theory discussed above which would save otherwise <u>untimely</u> acts.

materially adverse employment actions for the purposes of satisfying a prima facie case.  A jury could conclude that Ms. Owens' investigation was conducted to dig up dirt on plaintiff. Similarly, a jury could find that plaintiff's complaint was not properly investigated because Ms. Owens only focused on the immediately history of the disparate treatment as opposed to Sharpe's claim that the retaliation began in 1999.  She also interviewed employees plaintiff contends received preferential treatment, who she claims would not want to admit that they received such treatment.  A jury could find that plaintiff's March 28, 2007, verbal warning was a materially adverse act because it initiated the follow-up meetings and close monitoring of plaintiff's progress.  The May 24, 2007, written warning was even more adverse to plaintiff. The warning provided that a meeting would be held in 30 days to assess Sharpe's progress and "failure to demonstrate sustained improvement via timely, accurate, independent work will lead to further disciplinary action."  Colwin Decl., Ex. 55, Dkt. No. 16-20.  The written warning was placed in her personnel file and subjected her to further disciplinary action.  For these same reasons, plaintiff's placement on probation was materially adverse.  See Colwin Decl., Ex. 58, Dkt. No. 16-20.

Sharpe has not specifically explained how the 30, 60, and 90 day follow-up meetings were materially adverse but assuming for purposes of her motion that the feedback alleged was never given and that meeting notes were pre-drafted in a conspiracy to emphasize her weaknesses and ultimately fire her, the 30 day reviews are materially adverse.  Particularly when considering that other adverse actions like the written warning and her placement on probation occurred at the meetings, a jury could find the meetings to be materially adverse.

Finally, if as plaintiff contends, the Business Analyst training could have helped her improve and avoid termination, a jury could find her exclusion from the June 2007 training to be a materially adverse employment action.  Sharpe's contention that these acts were all in retaliation for her March 2007 complaint are conclusions that a jury is free to believe or disbelieve.  The defendant does not dispute that plaintiff's termination, act 19, was a materially adverse employment action.  Viewing the facts in the light most favorable to Sharpe, and in the absence of defendant's response to the above allegations, she has satisfied the third prong of a prima facie case with respect to acts 13 and 15 through 19.

To clarify, the following acts constitute materially adverse employment actions for purposes of this motion: 13) Ms. Owens' allegedly biased investigation of the March 2007 complaint; 15) the resulting discipline after the March 2007 complaint; 16) the 30, 60, and 90 day follow-up meetings with pre-drafted comments; 17) exclusion from the June 2007 Business Analyst training; 18) being placed on probation; 19) being terminated on September 13, 2007.

### 4. Causal Connection

The fourth prong of a prima facie case of retaliation can be established either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  Lore, 583 F. Supp. 2d at 368 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).  If relying on indirect evidence to create the casual nexus, the temporal proximity between an employer's knowledge of the protected activity and the adverse employment action must be "very close."

Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 1511 (2001)

(holding periods of three and four months between protected activity and adverse

employment action is insufficient to establish causal connection).  The Second Circuit

however has not established a "bright line" rule that defines "the outer limits beyond which a

temporal relationship is too attenuated to establish a causal relationship between the

exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman-Bakos

v. Cornell Co-op. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001).

      As discussed above only some of the actions following plaintiff's March 2007

complaint are both timely and materially adverse.  Causal connection need only be examined

with respect to acts 13 and 15 through 19.  Defendant first argues that too much time

elapsed between Sharpe's March 2007 internal complaints and her September 2007

termination to establish a causal connection based on temporal proximity alone.  Once again,

defendant ignores the other retaliatory actions between plaintiff's March 2007 complaint and

her eventual termination.

      Utica Mutual concedes that a time period of six months may create an inference of

retaliatory intent but argues that where timing is the only evidence plaintiff can point to, the

inference must fail.  See e.g., White v. Eastman Kodak, No. 06-CV-6493, 2009 WL 1514659,

at *10 (W.D.N.Y. May 29, 2009) (holding that six months between filing EEOC charge and

commencement of disciplinary investigation is too long to show temporal proximity in the

absence of any other evidence).  But see Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d

552, 562 (S.D.N.Y. 2005) (holding that six months between protected activity and discharge

is beyond time frame for inferring retaliatory causation but acknowledging substantial

intervening events that occurred between protected activity and adverse employment action,

severing an otherwise possible causal connection).  The sixth month window between plaintiff's March 2007 internal complaints and her September 13, 2007, termination may be sufficiently close enough when coupled with direct or circumstantial evidence of retaliatory animus.

A plaintiff may also establish a causal connection directly through evidence of retaliatory animus against her by the defendant.  Utica Mutual argues there is no evidence that any of the alleged decision makers harbored retaliatory animus and that any suggestion of such a motive is undercut by the undisputed fact that Sharpe received several positive evaluations from Ms. Wilson and Mr. Buttimer after her 1999 and 2003 DHR complaints. Plaintiff argues there is sufficient evidence to demonstrate that Utica Mutual acted with a retaliatory motive because she learned from Ms. Cabral that her supervisors blamed her for Mr. Murphy's death.[10]  For the purposes of this motion a reasonable jury could find a causal connection between plaintiff's March 2007 complaint and the materially adverse employment actions she suffered leading up to her September 2007 termination.  A fact finder could infer causation based upon Ms. Cabral's alleged admission and the temporal proximity between the events in question.

Accordingly plaintiff has demonstrated a prima facie case of retaliation.

**B.  Legitimate, Non-Retaliatory Reasons**

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant employer to "articulate some legitimate, nondiscriminatory reason for [the adverse act]."

---

[10] Defendant contends the alleged statement by Ms. Cabral is inadmissible hearsay and that Sharpe cannot rely on it to overcome a motion for summary judgment.  It is worth noting, without deciding, that the statement may be admissible if offered for the purpose of establishing Ms. Cabral's state of mind.

Leibowitz v. Cornell Univ., 584 F.3d 487, 499 (2d Cir. 2009) (internal quotations omitted). The employer's burden of articulating a legitimate, non-retaliatory reason for its actions is "not a particularly steep hurdle.  It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory."  Hirschberg v. Bank of Am., N.A., --- F. Supp. 2d ---, No. 08 CV 1611, 2010 WL 4872992, at *9 (E.D.N.Y. Dec. 1, 2010) (citing Seils v. Rochester City Sch. Dist., 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002)).

Utica Mutual claims Sharpe was disciplined following her March 2007 complaint and ultimately terminated because she was unable to fulfill the job responsibilities of a Senior Business Analyst.  They argue that the result of Ms. Owens' internal investigation, namely reports from Sharpe's co-workers regarding her inadequate performance, coupled with issues repeatedly raised in her past evaluations, formed the basis for the follow-up actions to the investigation including the 30, 60, and 90 day reviews, the warnings, the probation, and the ultimate decision to terminate her.  Plaintiff concedes that Utica Mutual has satisfied its burden to come forward with a legitimate, non-retaliatory reason with respect to her termination, thus shifting the burden back to her to prove defendant's proffered reasons are pretextual .  See Pl's. MOL, Dkt. No. 25, 21.  Plaintiff states:

> [A]t face value it would appear that plaintiff was discharged from her employment due to her "poor work performance" revealed during Ms. Owen's [sic] investigation.  It also appears that plaintiff was provided with extensive feedback and several opportunities to improve her work performance.  Admittedly, poor work performance could constitute a legitimate non-retaliatory reason for an employee's termination from employment.

Id.

Utica Mutual provided evidence that Sharpe was subjected to verbal and written warnings, 30, 60, and 90 day reviews, placed on probation, and ultimately terminated for her poor work performance.  During the course of her investigation, Ms. Owens interviewed 19[11] of Sharpe's co-workers.[12]  Several of them indicated they were frustrated with plaintiff's performance as a Senior Business Analyst and that she was given less complex projects on a regular basis.  Owens Aff., ¶ 31.  Co-workers reported that Sharpe constantly asked them for assistance in order to complete her assignments and they believed she actually received "preferential" treatment because she was not being held to the same standards as other employees when it came to job tasks and duties.  Id.; see generally Interview Summaries & Owens Report.  Ms. Owens' report prepared after meeting with the 19 employees noted there were ongoing concerns about plaintiff's grasp of the "deeper analytical aspects of her role" based on her co-workers' reports and as expressed in her current and prior evaluations.  Owens Report, 8.  She recommended Sharpe be "held accountable for functioning as a Senior Business Analyst" or else she would be receiving preferential treatment over her peers.  Id.

---

[11] It is unclear whether Ms. Owens interviewed 18 or 19 employees.  Her affidavit states that she interviewed 18 employees, but lists 19 names.  See Owens Aff., ¶ 26.  The "methodology" section of her report prepared after the investigation lists 18 people, excluding employee Mark Ribnikar who was listed in her affidavit.  See Colwin Decl., Ex. 47 ("Owens Report"), Dkt. No. 16-17, 3.  The "findings" section of her report however includes comments from Mr. Ribnikar.  Id. at 4.  Lastly, Ms. Owens' interview summaries prepared after meeting with each employee include a summary of notes from her meeting with Mr. Ribnikar.  See Colwin Decl., Ex. 46 ("Interview Summaries"), Dkt. No. 16-17, 3.  It can only be assumed that Ms. Owens made a typographical error in her affidavit and report and that she did interview all 19 employees.

[12] The following employees were interviewed: Ms. Wilson, Mr. Nobles, Mr. Buttimer, Ralph Whitehead (SIU Supervisor), Scott Todd (SIU Investigator), Bob McNamara (SIU Investigator), Wendy Tiffin (SIU Investigator), Bill Nelson (SIU Investigator), Jack Deshamps (SIU Investigator), Jill Roberts (Senior Business Analyst), Sue Hughes (Senior Business Analyst), Betty McDonald (Senior Business Analyst), Frank Verminski (Senior Business Analyst), Amy Burger (Business Analyst), Ken Cicarelli (Business Analyst), Becky Clark (Business Analyst), Mark Ribnikar (Claims Examiner), Denise Harvey (Business Analyst), and Angela Marino (Business Analyst).

Finally, with respect to plaintiff's exclusion from the June 2007 Business Analyst training, half of the Business Analysts were scheduled to attend the June 2007 training and the remaining half were scheduled to attend the September 2007 training.  See Colwin Decl., Ex. 57, Dkt. No. 16-20.  Ms. Wilson's notes prepared before the July 12, 2007,[13] meeting indicated she assigned employees to the training using the same criteria as in the previous year and that Sharpe attended the second session last year.  Her notes provided that she switched two employees' sessions due to two large projects, and that plaintiff should have come to her if she felt the June class would have helped her.  The notes indicated that if Sharpe had done so, Ms. Wilson may have been able to change the attendees.  Whether plaintiff's designation in the later training was arbitrary or motivated by retaliatory animus, defendant's explanation is a legitimate, non-retaliatory reason and is sufficient to shift the burden to plaintiff to demonstrate that her placement in the September training was retaliatory.

Defendant has offered legitimate, non-retaliatory reasons for the adverse employment actions that survived plaintiff's prima facie case.  Plaintiff concedes defendant's explanation with regard to her termination.  Utica Mutual has produced evidence of Ms. Owens' thorough investigation and explained plaintiff's exclusion from the June 2007 training.

### C.  Pretext

After a defendant satisfies its burden of articulating a legitimate, non-retaliatory reason for an adverse employment action, "the plaintiff must point to evidence that would be

---

[13] There is no record of a meeting held on July 12, 2007.  Presumably this was the original date for what later came to be the July 27, 2007, meeting.

sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  Utica Mutual argues plaintiff has presented no evidence of pretext.

To establish pretext, a plaintiff must produce sufficient evidence to cast doubt on defendant's legitimate, non-retaliatory reasons, and show that the employment decision "was more likely than not motivated, in whole or in part," by unlawful reasons.  Amin, 282 F. App'x at 962 (quoting Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000)); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[P]laintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [retaliation] was the real reason for the [employment action]) (citations and internal quotations omitted).

However a plaintiff is not required to disprove defendant's proffered reasons entirely.  See Fields v. N.Y. State Office of Mental Retardation and Dev. Disabilities, 115 F.3d 116, 120-21 (2d Cir. 1997).  Instead, a plaintiff may satisfy the third step of the McDonnell Douglas burden shifting analysis "by proving that an impermissible factor was a 'motivating factor,' without proving that the employer's proffered explanation was not some part of the employer's motivation."  Id. at 120; see also Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995) ("[P]laintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating factors.'").  Nevertheless if a plaintiff's "allegations are conclusory and unsupported by evidence of any

weight[,] they are insufficient to satisfy the requirements under Rule 56(e)."  Smith v. Am.
Exp. Co., 853 F.2d 151, 155 (2d Cir. 1988).

First, Sharpe disputes that a complete and appropriate investigation was performed
by Ms. Owens.  She asserts Ms. Owens ignored the retaliatory conduct related to her 1999
and 2003 DHR complaints and only focused upon the March 2007 complaints.  Plaintiff also
contends that upon inquiring from Mr. Nobles, Mr. Buttimer, and Ms. Wilson whether plaintiff
was being retaliated against, Ms. Owens accepted their denials without further inquiry.  See
Interview Summaries, 16-21.  As a result, Ms. Owens' investigation focused on the
"immediate history of plaintiff's disparate treatment" and instances of plaintiff being "picked
on."  Pl's. MOL, 22.  Sharpe maintains that the investigation and comments from co-workers
were tainted because four of the employees interviewed were those that plaintiff claimed
received preferential treatment from Ms. Wilson.[14]  Additionally she argues that the remaining
people interviewed were new employees or "were distanced in some other way, i.e., part-
time, seating location, etc." which contributed to the inadequacy of the investigation.  Id.  She
also finds it improper that Ms. Owens' notes following Ms. Wilson's interview were
substantially longer than those of plaintiff's other co-workers and criticizes the content of the
summaries relative to Mr. Buttimer and Mr. Nobles.  See Interview Summaries, 16-17.

The evidence does not support plaintiff's arguments.  Defendant's exhibits show
Ms. Owens conducted a thorough investigation of Sharpe's concerns.  Plaintiff expressed her
concerns to Ms. Owens via email on March 9, 2007, and a meeting was held between the
two on March 12.  In the weeks following, Ms. Owens met with 19 employees from at least

---

[14] These employees were Jill Roberts, Sue Hughes, Amy Burger, and Betty McDonald.

three different departments.  Plaintiff does not articulate which of these employees are new or sat a distance from her – as though to imply a lack of knowledge about the circumstances – but in any event, one of the newer employees interviewed was Becky Clark who plaintiff herself trained.  See Owens Report, 4.  Employees in the SIU department – a department on the "other side" of Claims and with whom plaintiff socialized with – were also interviewed. Interview Summaries, 4; Sharpe Aff. ¶ 109.  To imply that interviews with these employees were somehow irrelevant or tainted the investigation is unsupported.  Ms. Owens prepared summaries after meeting with each employee, and the length of those summaries was undoubtedly based on the length of the interview and what each employee had to say.  It is not surprising nor improper that Ms. Wilson, Mr. Nobles, and Mr. Buttimer's interview summaries were longer than those of other employees because they were the three people plaintiff claims to have retaliated against her.  At the end of her investigation Ms. Owens prepared an eight page report detailing her findings and recommendations.  See generally Owens Report.

Plaintiff's claim that the investigation was flawed and her disagreement with the conclusions reached are insufficient to establish pretext.  Even if the investigation was flawed, which is not supported by the evidence, a faulty investigation is not in and of itself evidence of pretext.  See Rodriguez v. City of N.Y., 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.").  The Rodriguez Court concluded that

in circumstances where the veracity of the employer's explanation and/or the thoroughness of the investigation is disputed, the Court should examine the entire record to determine whether there is evidence from which a reasonable jury could conclude that the deficiencies in the employer's investigation and/or the incorrect conclusion reached by the employer can be attributed to a discriminatory motive.

Id. In light of Utica Mutual's proffered legitimate, non-retaliatory reasons, the comprehensive investigation, and the lack of additional evidence as discussed below, a reasonably jury could not conclude that defendant's reason for Sharpe's termination was pretextual.

Sharpe also contends that Ms. Owens' conclusions are "inaccurate because the interviews themselves were tainted by the improper motive of retaliation" and that "[b]y redirecting the investigation to focus on plaintiff's alleged inadequate 'work performance,' Nobles, Buttimer and Wilson were able to place plaintiff on the defensive." Pl's. MOL, 23. Plaintiff offers no evidence to support these claims except her above attack on the thoroughness of the investigation. These conclusory allegations are not enough to raise a triable issue of fact regarding pretext.

Next, plaintiff disputes that her supervisors provided sufficient feedback during the review period prior to her termination and alleges she was never notified of what she needed to do to improve. She also claims Ms. Wilson prepared a written summary of the May 24, 2007, meeting over two weeks in advance of the meeting and that this demonstrates pretext. Following the March 2007 internal investigation, Ms. Owens met with plaintiff, Mr. Buttimer, and Ms. Wilson to advise plaintiff of the performance issues identified during her investigation. Plaintiff was advised she needed to improve and was given a document detailing her job expectations and core work tasks. She was advised of the responsibilities expected of a Senior Business Analyst and told it was expected she could handle each and

every one.  See Colwin Decl., Ex. 49, Dkt. No. 16-18.  She was given six months to improve, a time period suggested and implemented by Ms. Owens.

Many of the issues raised as a result of the internal investigation were reoccurring performance issues identified in previous evaluations, including plaintiff's need for supervision, her failure to identify and problem solve on her own, and her participation in non-work activities during work hours.  Plaintiff was informed that if she was unable to meet her responsibilities, she would be subject to Utica Mutual's "progressive disciplinary process, commencing with a written warning."  Colwin Decl., Ex. 49, Dkt. No. 16-18.  Ms. Owens advised plaintiff she should focus "more energy on positive and productive behaviors and less time engaging in nonproductive or non-work behaviors herself as well as monitoring the behavior of others."  Id.

Meetings with Ms. Owens, Mr. Buttimer, and Ms. Wilson were conducted at 30, 60, and 90 days intervals with plaintiff to discuss her performance.  During these meetings she was advised of areas in which she was fulfilling her responsibilities as well as issues still requiring improvement.  Her claim that she was not notified regarding how to improve is unsupported considering the feedback provided during the 30, 60, and 90 day meetings and the daily interactions between her and Ms. Wilson regarding ongoing projects, errors, and job duties.[15]  Similarly, Sharpe's allegation that Ms. Wilson's summaries prepared in advance of meetings demonstrates pretext is unsubstantiated.  The summaries Ms. Wilson prepared prior to the May 24 and July 25 meetings and one prepared by Mr. Buttimer in advance of the September 13, 2007, meeting were not summaries of the meetings themselves but were a

---

[15] The summaries provided by Ms. Wilson in advance of the May 24 and July 25, 2007, meetings detailed ongoing issues with plaintiff's job performance and also identified projects Sharpe was working on during the previous 30 day monitoring period.  See Colwin Decl., Exs. 54 & 57, Dkt. No. 16-20.

compilation of specific events during the prior 30 days, notes regarding Sharpe's performance, and concrete examples of her projects and respective feedback.  Based on the emails which accompanied the summaries sent to Ms. Owens in advance of the meetings, Ms. Wilson and Mr. Buttimer created the summaries to prepare for the meetings and to identify issues to address in the meetings.  Based on these facts the summaries are not evidence of pretext.

Finally, Sharpe claims that defendant's refusal to reschedule her for the June 2007 Business Analyst training "demonstrates an inference of pretext" because "had defendant really wanted to give plaintiff the opportunity to improve her work performance by the deadline, she should [sic] been allowed to attend the June class."  Pl's. MOL, 24.  This is nothing more than speculation.  Plaintiff cannot use her opinion to establish pretext.

Sharpe has not presented credible evidence to refute the substantial findings supporting Utica Mutual's determination that she was inadequately performing her job, especially in light of the number of co-workers who provided descriptions of her performance issues and the review period afforded by her supervisors prior to her termination.  Plaintiff is unable to establish that Utica Mutual's explanations for the materially adverse employment actions were a pretext for impermissible retaliation.  She has not satisfied her burden of demonstrating pretext and defendant's motion for summary judgment on the retaliation claim will be granted.

## V.  CONCLUSION

Plaintiff's hostile work environment claim will be dismissed on consent of the parties.  Plaintiff's retaliation claim will be dismissed because Utica Mutual satisfied its burden of providing legitimate, non-retaliatory reasons for the adverse employment actions

by establishing that Sharpe performed her job inadequately.  Plaintiff has not offered

evidence to refute those contentions and cannot establish that Utica Mutual's reasons for the

adverse employment actions were pretextual.  Accordingly defendant's motion for summary

judgment on plaintiff's retaliation claim will be granted and the complaint will be dismissed in

its entirety.

Therefore, it is

ORDERED that

1.  The First Cause of Action (Hostile Work Environment) is dismissed on consent

of the parties;

2.  Defendant Utica Mutual Insurance Company's motion for summary judgment on

the Second Cause of Action (Retaliation) is GRANTED; and

3.  The complaint is DISMISSED.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated: December 27, 2010
        Utica, New York.